23 So.3d 259 (2009)
Randy FONTENOT, et al.
v.
PATTERSON INSURANCE, et al.
Germaine Brooks, et al.
v.
City of Lafayette, et al.
No. 2009-C-0669.
Supreme Court of Louisiana.
October 20, 2009.
Order on Rehearing December 11, 2009.
*262 James D. Caldwell, Attorney General, Colleen Ann McDaniel, Asst. Atty. Gen., for Applicant.
*263 Allen & Gooch, Michael Edward Parker, Lafayette, Lawrence N. Curtis, Ltd., Larry Curtis, Gregory Karl Klein, Lafayette, Johnny Edward Wellons, Chiquita Patrece Tate, Baton Rouge, Simien & Miniex, APLC, Rickey Wayne Miniex, Lafayette, for Respondent.
GUIDRY, Justice.[*]
Upon initial consideration, this Court remanded the matter to the court of appeal for review of the jury's decision under the manifest error standard.[1] We have again granted certiorari in this case to address the narrow issue of whether the court of appeal, on remand, applied the proper standard of review to amend the jury's findings as to liability and the allocation of fault. Based on our detailed review of the record, we find the appellate court erred in substituting its judgment for that of the jury, rather than determining the jury's factual findings were reasonable. For the reasons that follow, we reverse the judgment of the court of appeal and reinstate the jury's verdict relative to liability and the allocation of fault.

FACTS
In March 2001, shortly after 11:00 p.m., Randy Fontenot, while operating a police cruiser in his capacity as an officer for the Lafayette City-Parish Consolidated Government (hereafter, "LCG"), was involved in a collision with a vehicle driven by Germaine Brooks. As a result of the accident, Mr. Fontenot was seriously injured. While Mr. Brooks sustained injuries, his passenger, Charlotte Phillips, died as a result of being ejected from his vehicle.
The incident took place at the intersection of Main and Morgan Streets in Broussard, Louisiana. Both streets are two-way roads with no physical separation between the lanes, and each had a posted speed limit of thirty-five miles per hour. Mr. Fontenot was traveling east on Main Street in the direction of Morgan Street. Mr. Brooks was operating his vehicle in a southerly direction on Morgan Street. At the time of the accident, the traffic signal regulating the flow of travel at the intersection was in a flashing sequence.[2] A flashing yellow light controlled Mr. Fontenot's travel on Main Street, the major artery. Mr. Brooks was subject to a flashing red light regulating the traffic on Morgan Street.
There were no eyewitnesses to the accident. Uncontested documentary evidence and witness testimony presented at trial indicated Mr. Brooks was traveling between eighteen and twenty-six miles per hour, and Mr. Fontenot was traveling at fifty-six miles per hour. The police report prepared in connection with the incident indicates the front of Mr. Fontenot's vehicle *264 made impact at the front passenger side of Mr. Brooks's vehicle, causing the latter vehicle to spin completely around counter clockwise and both vehicles to skid a considerable distance after striking each other. Mr. Brooks advised the investigating officer at the accident scene that he had come to a complete stop at the intersection, and that he proceeded after not seeing any approaching vehicles.

PROCEDURAL HISTORY

THE PETITIONS FOR DAMAGES
Two lawsuits were instituted as a result of the accident. As to the first, Mr. Fontenot and his wife, Susanne Fontenot, filed a tort action[3] seeking damages against Mr. Brooks and his insurance carrier, Patterson Insurance Company (hereafter, "Patterson Insurance"), asserting Mr. Brooks's negligent operation of his vehicle in failing to stop at the red light and/or proceeding into the intersection in the path of Mr. Fontenot's vehicle resulted in their damages. In a supplemental and amending petition, the Fontenots named as an additional defendant, among others,[4] the State of Louisiana, through the Department of Transportation and Development (hereafter, "DOTD"). They alleged the intersection was unreasonably dangerous due to an inappropriate traffic signal and insufficient street markings. LCG filed a third party demand and intervention against each of the named defendants seeking reimbursement of workers' compensation benefits paid to Mr. Fontenot. Following the insolvency of Patterson Insurance, the Louisiana Insurance Guaranty Association (hereafter, "LIGA") was substituted in its place as a defendant. See La. R.S. 22:1375, et seq.
The second suit was filed against Mr. Fontenot and LCG by Mr. Brooks and Leona Phillips, Charlotte's mother, seeking personal injury and wrongful death damages, respectively. The parties alleged Mr. Fontenot's negligent operation of his police vehicle, stemming from his excessive speed and failure to keep a proper look out, caused the accident. LCG filed a reconventional demand against Mr. Brooks and his insurer seeking monetary recovery for damages to its police vehicle and worker's compensation benefits paid to Mr. Fontenot. LCG also filed a third party demand against the DOTD, which prompted Mr. Brooks and Ms. Phillips to file an amending petition adding the DOTD as a defendant, citing the defectiveness of the intersection.

THE TRIAL COURT
The trial court consolidated the two suits. By the time the matter proceeded to a jury trial, the only remaining claims were those the Fontenots and LCG (hereafter collectively, "the plaintiffs"), had pending against the DOTD, Mr. Brooks, and LIGA.[5] At the four-day trial, in addition *265 to submitting considerable medical evidence, the parties presented documentary evidence and extensive expert testimony in the fields of accident reconstruction, traffic control, and highway design. As to the lay testimony, the essential testimony relative to the issue of liability was the testimony of the police officer that investigated the accident and prepared the incident report.[6]
The nature of the evidence introduced to the jury by the plaintiffs and the DOTD supported their claims that Mr. Brooks neglected to stop at the flashing red light upon reaching the intersection and, even if he did properly stop, he did not look for approaching traffic prior to proceeding forward. The DOTD, Mr. Brooks, and LIGA presented evidence supporting their allegations that Mr. Fontenot's negligent operation of his police cruiser resulted in his injuries, citing his excessive speed and failure to exercise caution when proceeding into the intersection.
As to the claims asserted against the DOTD, the parties urged Mr. Brooks's visibility was obscured by the presence of a public library building located on the corner of Morgan Street. They submitted expert testimony in support of their assertion that, to ensure all parties could safely travel through the inherently dangerous intersection, the mode of the light should have been configured for a four-way standard red-yellow-green light, instead of a flashing light. The parties also attempted to establish inadequate street markings contributed to Mr. Brooks's failure to come to a full and/or properly positioned stop at the intersection that would have afforded him adequate visibility of approaching traffic. Specifically, they argued the accident was attributable to the absence of a painted stop bar, also referred to as a "limit line" in La. R.S. 32:234(A)(1), for the traffic proceeding forward on the corner of Morgan Street. While they acknowledged the presence of a stop bar exclusively for the traffic turning left off of Morgan Street onto Main Street, the parties maintained that another stop bar should have been staggered by the DOTD in a position closer to the edge of the intersection so that there would be full visibility of the oncoming traffic on the intersecting street. As to the left turn lane stop bar, the plaintiffs, Mr. Brooks, and LIGA urged it "visually tricked" and confused Mr. Brooks into thinking he had to stop at that marking, which was in excess of eighteen feet from the intersection and had the library as a visible obstruction barring a proper outlook for approaching traffic.
At the conclusion of trial, while the jury was deliberating, the trial judge issued a judgment on the record, assigning liability as follows: 50% to Mr. Brooks; 50% to the DOTD; and 0% to Mr. Fontenot. The trial judge awarded LCG property damages against Mr. Brooks and the DOTD in the total amount of $19,994.87. Subsequently, following its deliberations, the jury entered a verdict assigning fault as follows: 90% to Mr. Brooks; 10% liability to Mr. Fontenot; and 0% liability to the DOTD. The jury awarded Mr. Fontenot special damages. In addition, it awarded damages for loss of consortium to Mrs. Fontenot and the Fontenots's minor *266 daughter. No general damages were awarded by the jury.
The Fontenots filed a motion for a judgment notwithstanding the verdict (hereafter, "JNOV"), or, in the alternative, a motion for new trial requesting the court readdress the jury's allocation of fault and the denial of general damages. The trial court granted the JNOV, in part, and awarded Mr. Fontenot an additional $500,000 in general damages.

APPELLATE REVIEW
Three separate appeals were taken from the inconsistent trial court rulings. While the Fontenots contested the jury's allocation of fault, the DOTD and LCG appealed the apportionment of fault rendered by the trial judge. The DOTD also objected to the award of general damages pursuant to the JNOV. Applying a de novo review, the court of appeal affirmed the jury verdict as amended by the trial judge's JNOV. However, it reversed the jury's allocation of liability, finding the jury erred in assessing any fault to Mr. Fontenot for the accident. The appellate court reduced Mr. Brooks's liability from 90% to 50%, and allocated the remaining 50% fault to the DOTD. Fontenot v. Patterson Ins. Co., 06-1624 (La.App. 3 Cir. 12/5/07), 972 So.2d 401.
Subsequently, this Court granted the DOTD's application for writ of certiorari challenging the court of appeal's application of a de novo standard of review. Fontenot v. Patterson Ins. Co., 08-0414 (La.6/6/08), 983 So.2d 907. We concluded, because the Fontenots and the DOTD each asserted their right to a jury trial, the jury had the authority to decide all claims pending against the DOTD. As such, the matter was remanded to the appellate court with instructions to review only the jury's verdict and to utilize the manifest error standard. Fontenot v. Patterson Ins. Co., 08-0414 (La.12/12/08), 997 So.2d 529.
On remand, the court of appeal concluded the jury manifestly erred as to the allocation of fault and reassessed liability by attributing Mr. Brooks with 60% fault and the DOTD with the remaining 40% fault. Fontenot v. Patterson Ins. Co., 06-1624 (La.App. 3 Cir. 2/18/09), 5 So.3d 954. In doing so, the trial court relied in full on the reasons articulated in its earlier opinion, wherein it had utilized a de novo standard of review.
Specifically, addressing the issue of liability, the appellate court found there was no breach of duty on the part of Mr. Fontenot. While it conceded the DOTD's evidence supported a finding he was speeding, the court determined the excessive speed was not a cause-in-fact of the accident. Rather, the court of appeal attributed the majority of fault to Mr. Brooks stemming from his failure to yield to Mr. Fontenot's vehicle. It opined Mr. Brooks's negligence could have only resulted from the visual obstruction caused by the public library when Mr. Brooks mistakenly stopped at the left turn lane bar.
As to the liability of the DOTD, the court of appeal, unlike the jury, found the testimony of the plaintiffs' experts to be more persuasive and well-reasoned than that of the DOTD's experts relative to whether the intersection was unreasonably dangerous. Upon concluding the absence of standard light configuration and a stop bar constituted defects causally-related to the accident, and that the DOTD had knowledge of the defects, it assessed the remaining 40% fault to the DOTD. Lastly, the appellate court found no merit in the DOTD's objection to the assessment of general damages pursuant to the JNOV. One member of the appellate panel dissented asserting the majority erred in substituting its judgment for the jury's reasonable *267 findings as to the allocation of fault.
We granted certiorari to determine whether the court of appeal misapplied the manifest error/clearly wrong standard of review in reversing the judgment of the jury regarding the issues of liability and the apportionment of fault. Fontenot v. Patterson Ins. Co., 09-0669 (La.5/22/09), 9 So.3d 130.

STANDARD OF REVIEW
In reviewing the factual findings of a trial court, we are limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100, p. 4 (La.1/16/96), 666 So.2d 612, 615. It is well settled that an appellate court may not disturb a jury's finding of fact unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Syrie v. Schilhab, 96-1027, p. 4 (La.5/20/97), 693 So.2d 1173, 1176. An appellate court must do more than simply review the record for some evidence which supports or controverts the findings. Stobart v. State of La., through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La. 1993). It must instead review the record in its entirety to determine whether the factual findings were clearly wrong or manifestly erroneous. Id.
Significantly, the issue to be resolved is not whether the jury was right or wrong, but whether its conclusion was reasonable. Id. Thus, this Court, after a full review of the record, may not reverse reasonable findings, even if we had weighed the evidence differently sitting as the trier of fact. Siverd v. Permanent General Ins. Co., 05-0973, p. 3 (La.2/22/06), 922 So.2d 497, 500.

DISCUSSION

LIABILITY

Burden of Proof
Indisputably, more than one party may be at fault for the damages sustained in the vehicular accident giving rise to these proceedings. This is premised in Louisiana's comparative negligence scheme articulated in La. C.C. art. 2323. In deciding which parties are responsible, this Court has adopted a duty-risk analysis to establish the existence of delictual liability under La. C.C. art. 2315. Lazard v. Foti, 02-2888, p. 3 (La.10/21/03), 859 So.2d 656, 659. "In determining whether liability exists under a duty-risk analysis, a plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, that [the] defendant owed a duty to [the] plaintiff which [the] defendant breached and that the risk of harm was within the scope of protection afforded by the duty breached." Campbell v. La. Dept. of Transp. & Dev., 94-1052, p. 5 (La.1/17/95), 648 So.2d 898, 901, citing Mundy v. Dept. of Health and Human Resources, 620 So.2d 811 (La.1993). The duty-risk analysis is applicable for our consideration of whether Mr. Brooks and Mr. Fontenot should be apportioned fault for the accident.
Regarding the DOTD's liability, the pertinent legal principles are somewhat different insofar as tort claims may be pursued against the public entity under La. C.C. art. 2317 and La. R.S. 9:2800 strict liability, as well as in negligence pursuant to La. C.C. art. 2315. Henderson v. Nissan Motor Corp., 03-0606, pp. 5-6 (La.2/6/04), 869 So.2d 62, 66-67. When addressing an action under either theory, the legal analysis is the same. The plaintiff bears the burden of showing that: (1) the DOTD had custody of the thing that caused the plaintiffs injuries or *268 damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) the DOTD had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiff's injuries. Netecke v. State ex rel. DOTD, 98-1182, 98-1197, p. 7 (La.10/19/99), 747 So.2d 489, 494.
We now apply these principles to address the reasonableness of the jury's findings relative to the liability of Mr. Brooks, Mr. Fontenot, and the DOTD.

Mr. Brooks
Both the jury and the court of appeal found that Mr. Brooks was negligent and his actions were a cause-in-fact of the damages incurred by the Fontenots and LCG. Unquestionably, Mr. Brooks, in his capacity as a motorist, owed a legal duty to use reasonable care in the operation and control of his vehicle. See La. R.S. 32:58. The flashing red light controlling his lane of travel required that he stop at the intersection in a position where he had "a view of approaching traffic on the intersecting roadway [i.e., Main Street] before entering the intersection." La. R.S. 32:123(B). See also La. R.S. 32:234.[7] Moreover, he was barred from proceeding through the intersection until he yielded the right of way to those vehicles that constituted an immediate hazard. La. R.S. 32:123(B).
Based on our review, we agree with the lower courts that Mr. Brooks was negligent in the operation and control of his vehicle, and that his negligence was a substantial cause of the accident. The police report indicates Mr. Brooks advised Sergeant Elliot Thomas of the Brossard Police Department at the scene of the accident that he came to a complete stop at the intersection, and that "he looked both ways not seeing any oncoming vehicles on Main Street before he began entering the intersection." This statement was corroborated by the trial testimony of Sergeant Thomas, who prepared the report.
There is no evidence to contradict Mr. Brooks's assertions that he stopped and looked before entering the intersection. Rather, his negligent actions stem from his failure to see what he should have seen. In support, the undisputed testimony of Dr. Andrew McPhate, P.E., the DOTD's expert in the field of vehicle dynamics and accident reconstruction, indicates Mr. Brooks was traveling between nineteen *269 and twenty-six miles per hour, and Mr. Fontenot was traveling at approximately fifty-six miles per hour. He concluded, utilizing these respective calculated speeds, Mr. Fontenot was clearly approaching the intersection when Mr. Brooks proceeded from his stop. Mr. Brooks should have seen the police cruiser, and should have not entered the intersection before yielding the right of way, and is at fault because he did neither.
As for the reason why Mr. Brooks did not see the approaching vehicle, in the absence of his testimony at trial, we are only guided by the police report, which was admitted into evidence. While it provides there were no vision obscurements for either driver, the report indicates Mr. Brooks's "condition" at the time of impact was "inattentive or distracted." The jurisprudence provides, "[i]f a motorist fails to see what he should have seen, the law charges him with having seen what he should have seen, and the court examines his subsequent conduct on the premise that he did see what he should have seen." Fernandez v. General Motors Corp., 491 So.2d 633, 636-637 (La.1986). Mr. Brooks breached his duty to use reasonable care, which encompassed within it a risk that an approaching driver could be simultaneously present on the road traveling at an excessive rate of speed. Therefore, we determine the jury did not err in finding that Mr. Brooks was at fault in causing the accident.

Mr. Fontenot
Next, we examine whether the jury manifestly erred in concluding that Mr. Fontenot is partly responsible for the accident. As a motorist approaching an intersection controlled by a flashing yellow light, Mr. Fontenot was legally obligated to exercise caution and vigilance in order to ascertain whether he could safely proceed into the crossing. La. R.S. 32:234.[8] The degree of caution required of a person approaching a flashing yellow light includes approaching at a reasonable speed and maintaining a proper lookout for danger. Logically, what constitutes a reasonable speed and a proper lookout depends on the facts of each case.
Mr. Fontenot is not immune from liability simply because he was engaged in law enforcement-related tasks at the time of the accident. Although he was operating a police cruiser, he was still under a duty to drive in due regard for his own safety and others in accordance with the surroundings and circumstances that were in existence. With this in mind, it is undisputed that he was traveling at an excessive speed, and did not have his flashing lights or siren activated. La. R.S. 32:24 affords traffic privileges to the drivers of emergency vehicles while providing protection to the citizens in the community. In pertinent part, emergency drivers, under certain circumstances, are permitted to proceed through red/stop signals after slowing down, safely exceed the maximum speed limits, and disregard regulations governing the direction of movement. La. R.S. 32:24(B). However, we agree with the court of appeal that La. R.S. 32:24 does not apply in defense of Mr. Fontenot's actions. Based on the record, we find Mr. *270 Fontenot was not "responding to an emergency call, or in the pursuit of an actual or suspected violator of the law" as is required for implication of the privilege. La. R.S. 32:24(A).[9] Therefore, his actions are gauged by an ordinary standard of care, rather than a gross negligence standard when the privilege is applicable, since his conduct does not meet the requirements of La. R.S. 32:24. Rabalais v. Nash, 06-0999, p. 5 (La.3/9/07), 952 So.2d 653, 657-658; Lenard v. Dilley, 01-1522, p. 6-7 (La.1/15/02), 805 So.2d 175, 180. Pursuant to La. R.S. 32:58, Mr. Fontenot was bound by the same motorist's duty as Mr. Brooks to use reasonable care in the operation and control of his vehicle. Thus, he had a duty to see that which a reasonably prudent observer would have seen under similar circumstances. Fernandez, 491 So.2d at 636.
Applying these principles, we conclude the jury did not err in finding Mr. Fontenot was negligent in the operation of his vehicle. There is no evidence that he took any measures to reduce his speed when approaching the intersection, although he was exceeding the speed limit by approximately twenty-three miles per hour. This failure rendered him unable to ascertain whether he could proceed into the intersection safely. If he had slowed down and looked for oncoming traffic, as required by law, he would have undoubtedly seen Mr. Brooks's vehicle stopped, or proceeding forward at a speed significantly below the thirty-five miles per hour speed limit. Upon seeing Mr. Brooks's vehicle, he could have taken some prophylactic measures to avoid the collision.
We concede Mr. Fontenot had a valid expectation that Mr. Brooks, when confronted with a blinking red light would stop and yield the right of way. However, it strikes the Court that Mr. Fontenot relied on the flashing yellow caution light to the same extent as he would have for a green light, and in this reliance he was in error. His duty of care included the duty to keep his vehicle under control and to maintain a proper lookout for hazards at all times. Edwards v. Horstman, 96-1403, p. 6 (La.2/25/97), 687 So.2d 1007, 1011. Therefore, we agree with the jury that Mr. Fontenot's negligence was a contributing cause of the accident. The court of appeal erred in substituting the jury's reasonable findings in this regard.

DOTD
Lastly, we review the jury's determination that the DOTD was not liable for the accident giving rise to the proceedings. The primary duty of the DOTD is to continually maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. La. R.S. 48:21(A); Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1172 (La.1986). It is the DOTD's knowledge, constructive or actual, which gives rise to the obligation to take adequate *271 measures necessary to prevent injury. Rhodes v. State, Through Dep't of Transp. & Dev., 95-1848 (La.5/21/96), 674 So.2d 239, 242. Notably, the DOTD's duty of care extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive. Ledbetter v. State Through Dept. of Transp. & Development, 502 So.2d 1383, 1387 (La.1987).
Nonetheless, this Court is also cognizant that the DOTD is not a guarantor of the safety of all the motoring public under every circumstance. Netecke v. State ex rel. DOTD, 98-1182, 98-1197, p. 8 (La.10/19/99), 747 So.2d 489, 495. Nor is the DOTD the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway. Id. This Court has also held that the DOTD's failure to design or maintain the state's highways to modern standards does not establish the existence of a hazardous defect in and of itself. Myers, 493 So.2d at 1173. In other words, we will not impose liability for every imperfection or irregularity, but only a condition that could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983). Whether the DOTD breached its duty, that is, whether the intersection was in an unreasonably dangerous condition is a question of fact and will depend on the facts and circumstances of each case. Cormier v. Comeaux, 98-2378, pp. 6-7 (La.7/7/99), 748 So.2d 1123, 1127.
As stated, the plaintiffs, Mr. Brooks, and LIGA allege the DOTD's liability stems from the unreasonably dangerous condition of the intersection resulting from the flashing configuration of the traffic signal and absence of a stop bar. While the DOTD does not contest it had custody and control of the intersection, it emphatically disputes the intersection was defective and that it was a cause-in-fact of the resulting injuries. At trial, the jury was faced with conflicting expert testimony relative to whether the intersection was unreasonably dangerous at the time of the accident.
In support of their claims against the DOTD, the plaintiffs relied generally on the testimony and written report of Archie Burnham, the Fontenots's engineering expert in the field of traffic safety. He testified at trial that the failure to place a stop bar for traffic proceeding forward on Morgan Street contributed to Mr. Brooks's inability to come to a properly positioned stop at the intersection that would have afforded him full visibility of approaching traffic. Mr. Burnham agreed with the DOTD's contention that the purpose of the left turn lane stop bar was to prevent cars turning from Main Street onto Morgan Street from "clipping" those waiting to turn left from Morgan Street. However, he claimed, due to the absence of a stop bar for the vehicles proceeding forward on Morgan Street, the left turn stop bar influenced Mr. Brooks into thinking he had to stop at that marking, which barred visibility down Main Street due to the presence of the library. Mr. Burnham contended the potential danger arising from such was exacerbated at night.
In support of his assertions, Mr. Burnham noted the DOTD's PM-01 Standard Plan, a general plan utilized by DOTD engineers in road design, indicated stop bars should be placed at four-way intersections. Similarly, he relied on the Manual on Uniform Traffic Control Devices (hereafter, MUTCD), which sets forth the minimum standards of the DOTD in the construction and maintenance of its roads and highways. It also recommended placement of stop bars at intersections. Mr. Burnham alleged the DOTD's negligence stemmed from its noncompliance *272 with the PM-01 Standard Plan and the MUTCD. However, on cross-examination, he conceded a deviation from the two written authorities would be permissible if engineering factors warranted such, and, in such cases, deference should be rendered to the professional judgment of the design engineer on the respective project.
As additional evidence of the DOTD's failure to implement adequate safety measures, Mr. Burnham concluded the DOTD had not performed a traffic engineering update on the intersection since the installation of the light twenty years prior to the accident. His observation was premised solely on the general fact there had been eighteen prior accidents at the same location, eleven of which involved similar accident scenarios (i.e., traffic approaching from east bound on Main Street).[10] He suggested such a study would have revealed the fact many accidents had occurred and the need for additional safety measures, such as a stop bar.
Finally, Mr. Burnham testified that the intersection was unreasonably dangerous because the traffic signal was configured in a flashing mode to accommodate the evening reduction in travel. He opined that the intersection would have been "safer" and "better" had the light been configured in a standard red-yellow-green sequence or, in the alternative, four-way red flashing signal. When asked on cross-examination what statutory or codified support he had for his assertions, Mr. Burnham alleged there was none, and that his claims were based on his professional judgment.
The DOTD submitted in its defense the testimony of several of its employees and experts relative to the condition of the intersection at the time of the accident. Peter Allain, the DOTD's traffic engineering administrator, testified that engineering studies were done on the intersection at various times through the years to ensure compliance with the required design and maintenance standards of the MUTCD and the American Association of State Highway and Transportation Officials. Similarly, Richard Savoie, the DOTD's project development engineer and road and highway design expert, testified the intersection's traffic flow and safety controls were studied in preparation for a highway improvement project that took place in the year 2000. As to the DOTD's alleged noncompliance with the PM-01 Standard Plan, Mr. Savoie explained it is a general plan used for all DOTD projects. He stated that, while the PM-01 Standard Plan generally calls for placement of a stop bar on four-way intersections, the detailed plan prepared by the design engineer for a specific project dictates the work conducted. In noting the design plan as implemented for the 2000 improvement project did not specify placement of an additional stop bar at the edge of intersection, Mr. Savoie maintained there is no blanket DOTD policy that stop bars must be placed at every intersection. When asked why there was no design requirement, Mr. Savoie responded that it was important that design engineers be allowed to exercise their professional judgment on a de facto basis.
Dr. Jack Humphries, the DOTD's expert in traffic engineering and highway design, testified the placement of an additional stop bar would not have prevented the accident at issue. He opined Mr. Brooks failed to stop at a point where he could see approaching traffic and/or proceeded into the intersection without any regard for oncoming traffic. He also stated the flashing configuration of the light *273 did not render the intersection unreasonably dangerous, citing the significant reduction in travel in the late night hours. Mr. Humphries also observed the MUTCD did not prohibit the use of a flashing light under such circumstances.
Finally, Dr. McPhate, the DOTD's expert in accident reconstruction, testified that the surface of the intersection had no visual defects. He corroborated the testimony of Mr. Burnham, the Fontenots's expert in traffic safety, that the library did pose a potential physical obstruction for a driver proceeding forward on Main Street when positioned at the left turn stop bar. However, Dr. McPhate emphasized that the library did not cause an obstruction when a driver is properly positioned at the edge of the intersection.
Having reviewed and considered the evidence in its entirety, it is evident the parties essentially agree on the salient facts surrounding the accident, and the jury's decision as to the DOTD's liability turned on its choice between two theories of liability presented by the experts. Employing the principles of appellate review, our only inquiry at this stage is whether the jury's factual findings were reasonable, regardless as to how we may have weighed the evidence sitting as trier of fact. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). In the absence of finding the testimony of the DOTD's experts to be so internally inconsistent or implausible, this Court is barred from discrediting their statements to conclude the jury's findings were clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). This is attributable to the fact the jury was in a better capacity to evaluate the demeanor of the live witnesses, as compared with our access to only a cold record. Id., 549 So.2d at 844 ("When findings are based on determinations regarding the credibility of witnesses, the manifest error  clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said."). Under this standard, we are aware that when "a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous." Id., 549 So.2d at 844-845.
Applying these precepts, we find no error in the jury's decision to place greater weight on the evidence presented by the DOTD. The evidence was not in any respect internally inconsistent or unworthy of belief to warrant a substitution of the jury's credibility determination. The parties presented valid arguments why the placement of an additional stop bar or modified traffic light configuration would make the intersection safer. However, this court will not infer the intersection constituted an unreasonable risk of harm solely from the fact that an accident occurred. Netecke, 98-1182, 98-1197 at 8, 747 So.2d at 495.
Rather, the record clearly establishes, as properly determined by the jury, that the accident was caused exclusively by driver error. As we have already discussed, Mr. Fontenot breached his duty to exercise caution and vigilance when he proceeded into the intersection at an excessive rate of speed in the face of approaching traffic. See La. R.S. 32:234. Mr. Brooks's travel was dictated by the red light, under which he had a legal duty to position his stop at the intersection where he would have been able to see approaching traffic on Main Street, regardless of whether a stop bar was present. See La. R.S. 32:123(B) and La. R.S. 32:234. Moreover, Mr. Brooks unquestionably breached his legal obligation to not proceed into the intersection *274 until he had yielded the right of way to those vehicles constituting an immediate hazard, namely, Mr. Fontenots's vehicle. Id.
We have also considered the court of appeal's reasons for reversing the jury's findings as to the DOTD's liability. To conclude the intersection was unreasonably dangerous and the cause of the accident, the court of appeal seized on the fact the evidence showed the public library posed an obstruction in some respect. Coupled with Mr. Brooks's statement in the police report that he stopped at the intersection, the appellate court speculated the cause of the accident could have only stemmed from Mr. Brooks being visually tricked into stopping at the left turn stop bar and his view being obstructed from the library due to the absence of a stop bar for traffic proceeding forward. We disagree with the court of appeal's conjecture.
It is undisputed that the parties proved the public library posed an obstruction in proximity to the intersection. However, the evidence reflects the obstruction is only at issue when a driver is positioned at the left turn lane stop bar at the intersection on Morgan Street, and not for traffic proceeding forward if a driver is properly positioned at the edge of the intersection. While the appellate court accepted Mr. Brooks's statement that he stopped at the intersection, it failed to give credence that the report also reflected there were no visual obscurements. The record is absent any indication Mr. Brooks advised Sergeant Thomas, the investigating officer, that his vision was obstructed by the library or that he mistakenly stopped at the left turn lane stop bar instead of the edge of the intersection. Undoubtedly, these are two crucial factors worthy of reporting had they contributed to the accident. Instead, Mr. Brooks told Sergeant Thomas that he looked both ways and did not see approaching traffic. Based on these reasons, we find the court of appeal erred in finding that the intersection constituted an unreasonable risk of harm to the motoring public that resulted in the accident.

ALLOCATION OF FAULT
Next, we turn to address whether the jury was, based on the evidence presented at trial, manifestly erroneous in apportioning Mr. Brooks 90% fault and Mr. Fontenot 10% fault. The law provides we must give great deference to the allocation of fault as determined by the trier of fact. Clement v. Frey, 95-1119, 95-1163, p. 7 (La.1/16/96), 666 So.2d 607, 610. We are also aware that the allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the factfinder within that range cannot be clearly wrong. Foley v. Entergy La., Inc., 06-0983, p. 32 (La.11/29/06), 946 So.2d 144, 166. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award. Clement, 95-1119 at 7, 666 So.2d at 611.
As to the allocation of fault, the trier of fact is bound to consider the nature of each party's wrongful conduct and the extent of the causal relationship between that conduct and the damages claimed. Watson, 469 So.2d at 971. We are guided by the factors articulated in Watson: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Id., 469 So.2d at 974.
*275 Our review of the record in its entirety convinces us that the jury's findings as to the allocation of fault are reasonable. For the reasons already discussed, we find no error in the assessment of the majority of the fault to Mr. Brooks. He was traveling on the minor artery, which required him to yield to approaching traffic on Main Street, the major intersecting artery. Mr. Brooks's failure to see what he should have seen prior to proceeding into the intersection, seemingly due to his inattention and inadvertence, directly resulted in the death of his passenger, the critical injuries suffered by Mr. Fontenot, and the LCG's property damages.
Additionally, the apportionment of 10% fault to Mr. Fontenot is unquestionably reasonable under the facts presented to the jury. Although faced with a caution light, Mr. Fontenot traveled at an excessive rate of speed through an intersection without consideration of any other travelers on the roadway. His failure to exercise caution and vigilance as required under the law prevented him from seeing what he should have seen, in this case, Mr. Brooks's oncoming vehicle.

CONCLUSION
Based upon our review, we determine the jury's factual findings as to the determinations of liability and allocation of fault were not manifestly erroneous. The court of appeal erred in reversing the jury's allocation of fault and, as such, in reassessing fault and damages.[11]

DECREE
For the reasons stated herein, we reverse the court of appeal's judgment as to the allocation of liability and assessment of damages and costs and reinstate the jury's verdict.
REVERSED.

APPLICATION FOR REHEARING
Rehearing granted in part; denied in part. Rehearing in granted for the limited purpose of amending this Court's opinion to omit reference to the documentary evidence and proffered evidence not presented for the jury's consideration. This amendment does not affect the holding of the opinion or the principles stated therein, but is made solely for the purpose of complete accuracy. In all other respects, the plaintiffs' motion for rehearing is denied.
NOTES
[*] Judge Benjamin Jones, of the Fourth Judicial District Court, assigned as Justice Pro Tempore, participating in the decision.
[1] Following bifurcated trial proceedings in this matter, the court of appeal rendered an opinion attempting to reconcile the conflicting decisions rendered by the jury and the trial court. Fontenot v. Patterson Ins. Co., 06-1624 (La.App. 3 Cir. 12/5/07), 972 So.2d 401. Based on our review, we determined the jury had the authority to decide all actions pending against the State of Louisiana, through the Department of Transportation and Development, since it was not entitled to a judge trial under the facts. As a result, we remanded the case to the appellate court with instructions to review the jury's verdict utilizing the manifest error standard. Fontenot v. Patterson Ins. Co., 08-0414 (La.12/12/08), 997 So.2d 529.
[2] The traffic signal converts to a flashing sequence daily from 11:00 p.m. to 5:00 a.m. The signal had converted to a flashing mode from the standard red-yellow-green sequence minutes before the accident. The actual timing of the conversion of the light is unrelated to the cause of the accident.
[3] The Fontenots also filed the lawsuit on behalf of their minor daughter, Lauren Fontenot, for loss of consortium.
[4] Subsequent to their initial filing, the Fontenots instituted suit against the City of Broussard alleging a public library located at the corner of the intersection caused an obstruction to Mr. Brooks's view while at his designated stop and contributed to the accident. The other named defendants were Cupper Enterprises, Inc., a/k/a Country Station (hereafter, "Cupper"), and its insurer, One Beacon Insurance. Cupper was the owner of a convenience store where Mr Fontenot's vehicle ultimately came to a rest after striking a steel post on its property. For various reasons, these parties are no longer subject of this litigation.
[5] Prior to trial, the claims set forth by Mr. Brooks and Ms. Phillips were settled and/or dismissed. As such, the only issues ripe for trial were LCG's demand as a plaintiff in reconvention against Mr. Brooks, and the Fontenots's principal demands against Mr. Brooks and the DOTD.
[6] Mr. Brooks did not appear for the trial proceedings, although he was subpoenaed by the DOTD to testify. While his deposition testimony was submitted into evidence, it was not produced at trial for the jury's consideration. Also, Mr. Fontenot was unable to testify about the events surrounding the accident due to a residual amnesic disorder resulting from injuries sustained in the accident subject of these proceedings.
[7] The duty of a motorist approaching a flashing red signal is set forth in La. R.S. 32:234, entitled "Flashing Signals," which provides in pertinent part:

A. Whenever an illuminated flashing red... signal is used in a traffic sign or signal, it shall require obedience by vehicular traffic as follows:
(1) FLASHING RED (STOP SIGNAL) When a red lens is illuminated with rapid intermittent flashes, drivers of vehicles shall stop before entering the nearest cross-walk at an intersection or at a limit line when marked, or, if none, then before entering the intersection, and the right to proceed shall be subject to the rules applicable after making a stop at a stop sign....
The rules regarding stops at stop signs are provided in La. R.S. 32:123, entitled "Stop signs and yield signs." It states in pertinent part:
B. Except when directed to proceed by a police officer or a traffic-control signal, every driver and operator of a vehicle approaching a stop intersection indicated by a stop sign shall stop before entering the cross walk on the near side at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering the intersection. After having stopped, the driver shall yield the right of way to all vehicles which have entered the intersection from another highway or which are approaching so closely on said highway as to constitute an immediate hazard.
(Emphasis added.)
[8] The duty of a motorist approaching a flashing red signal is articulated in La. R.S. 32:234, which states, in part:

A. Whenever an illuminated flashing ... yellow signal is used in a traffic sign or signal, it shall require obedience by vehicular traffic as follows:
(2) FLASHING YELLOW OR AMBER (CAUTION SIGNAL)  When a yellow lens is illuminated with rapid intermittent flashes, drivers of vehicles may proceed through or past such signal only with caution.
[9] In denying the statutory protection afforded under La. R.S. 32:24, we rely on the testimony of Officer Jason Robicheaux of the Lafayette Police Department. He testified he arrived at a home in response to a domestic disturbance 911 call around the same time as Mr. Fontenot. The caller reported threats made by her husband. As the officers were speaking to the caller in the front of her home, her husband passed by in a vehicle. Officer Robicheaux testified he and Mr. Fontenot decided to drive around to look for the caller's husband so that they might have the opportunity to question him. Officer Robicheaux testified that, while they both left the home in a "hurried fashion," he did not consider it an emergency. He also confirmed they did not turn on their audible or visual sirens.
[10] No evidence was presented to the jury regarding the specific facts relevant to the accidents. Nor were they presented the time period during which the accidents occurred.
[11] As a result of the reinstatement of the jury's verdict, our consideration of the DOTD's assignment of error relative to the trial court's award of general damages pursuant to the JNOV is pretermitted.