39 So.3d 685 (2010)
Fay C. GRAFF and Wilfred Graff
v.
JEFFERSON PARISH HOSPITAL SERVICE DISTRICT NO. 2 d/b/A Wellness Center of East Jefferson General Hospital.
No. 09-CA-598.
Court of Appeal of Louisiana, Fifth Circuit.
March 23, 2010.
Writ Denied June 18, 2010.
*686 Sean P. Early, Wendy Gaudin Gremillion, Klotz & Early, New Orleans, Louisiana, for Plaintiffs/Appellants.
Jacqueline H. Blankenship, Rebecca Beck, Chehardy, Sherman, Ellis, Murray, Recile, Griffith, Stakelum & Hayes, Metairie, Louisiana, for Defendant/Appellee.
Panel composed of Judges MARION F. EDWARDS, WALTER J. ROTHSCHILD, and FREDERICKA HOMBERG WICKER.
MARION F. EDWARDS, Judge.
Plaintiffs/appellants, Fay and Wilfred Graff, filed a petition for damages against Jefferson Parish Hospital Service District No. 2 d/b/a Wellness Center of East Jefferson General Hospital ("Hospital" or "Wellness Center"). Mrs. Graff alleged that she was injured by the closing of an automatic door as she exited a hospital rehabilitation facility and was knocked to the ground. In this nonjury trial, the trial court granted a motion for a directed verdict in favor of the Hospital. On appeal, Mrs. Graff argues the following: (1) the trial judge erred in sustaining the Hospital's hearsay exception; (2) the trial judge was manifestly erroneous in failing to find that there was an unreasonably dangerous condition and in failing to find that the Hospital did not have notice of the condition.
Mr. and Mrs. Graff allege that the accident occurred on January 16, 2006. They asserted both premises liability and negligence on the part of the Hospital.
Testifying at trial, were the Graffs and Mrs. Graffs mother, Vera H. Cornman; two Wellness Center employees/physical therapists, Angelle Ream and Amelia Embley; two medical experts, Dr. William Johnson Jr. and Dr. Walter Eversmeyer; and the owner of a door company that performs service work for the Hospital, Tim Borgardt. In addition, medical records, maintenance records on the doors, and Ms. Ream and Ms. Embley's depositions were introduced into evidence.
After undergoing a leg amputation, Ms. Cornman lived with Mr. and Mrs. Graff. Ms. Cornman testified her daughter transported her to the Wellness Center for her therapy twice a week. The purpose of the rehabilitation was to teach her to walk with a walker and to use a prosthetic device. On a few occasions, Ms. Cornman used a wheelchair. Usually, however, she arrived there using a walker. Both Mrs. Graff and Ms. Cornman testified that, on the date of the accident, Ms. Cornman was using a walker.
Ms. Cornman stated that, on the day of the accident, someone other than herself or her daughter pushed a button causing the doors to open. However, she did not see anyone walking ahead of them. Ms. *687 Cornman did not know how long the doors had been open before they attempted to walk out. Ms. Cornman explained that her daughter assisted her as she hopped while holding onto the walker. Ms. Cornman's daughter's arms were around Ms. Cornman's waist in order to help her mother balance. When they arrived at the door, the heavy door started to close, and neither she nor her daughter could move out of the way. When they observed the door closing, they yelled, but the door knocked them to the floor. Ms. Cornman landed on top of her daughter. She stated that the door would have required great effort to push open. Ms. Cornman stated that she was not injured from the fall but suffered only slight soreness.
Mrs. Graff testified similarly. She stated that she probably walked in and out of the Wellness Center six times before the accident, using the doors without incident. When referred to her deposition testimony in which she stated she had pushed the button to open the door, she replied that she might have made that statement but, at the time of her trial testimony, she did not recall pushing the button. Mrs. Graff explained that the door closed quickly with such force that she did not have time to put out her hand. She stated that she was thrown backward and suffered injuries as a result. She stated that, approximately six months before this accident, she slipped off a ladder and fell. However, she testified that the pain from that incident had resolved. Mrs. Graff eventually had low back surgery in March 2007 and was hospitalized for a second back surgery because of complications from the first surgery. At the time of trial, she stated that she spent most of her day in bed and was still being treated for injuries related to the accident.
Ms. Ream testified that she is employed by the Hospital as a physical therapist. She treats patients, who vary in age, for various muscular, skeletal, or neurological conditions. However, most of her patients are either handicapped or elderly. Ms. Ream was treating Ms. Cornman with balance and gait training as well as with the use of a walker. At trial, she did not recall whether Ms. Cornman had a prosthesis. She testified that Ms. Cornman probably did not need Ms. Ream to hold onto her all of the time as Ms. Cornman was walking with a walker. Typically, a patient who arrived in a wheelchair would also be wheeled out.
Before Hurricane Katrina struck the area in August 2005, the Hospital's rehabilitation unit was located near but not at the Wellness Center. The accident occurred approximately four months after the rehabilitation unit moved to the Wellness Center. They first saw patients at the Wellness Center after this post-Katrina move. According to Ms. Ream and Ms. Embley, the rehabilitation unit moved to the Wellness Center around September or October 2005. They testified that the Wellness Center has front and side entrances. Both Ms. Ream and Ms. Embley stated that the accident took place at the side doors adjacent to the rehabilitation unit, the door used by most patients.
The door in question could be operated automatically by pressing a push plate or manually by pushing a bar. If the door opened automatically, it remained opened for a predetermined time delay and then closed. Ms. Ream stated that the door did not have an automatic sensor. She remembered another incident when someone was going through the door as it was closing, and she caught the door. However, she did not recall if this took place before or after the accident. Ms. Ream also testified she had previously stated there had been "near misses" but did not *688 necessarily know if they were before or after the accident.
Ms. Embley testified that she is a physical therapist and the supervisor of outpatient rehabilitation for the Hospital. The rehabilitation unit treats people who are fully ambulatory, as well as those who are wheelchair-bound. The doors in question had a time delay upon opening, but she was unaware of the length of that "hang time," which had been the same since 2000 when it opened as a handicap door. Because of the varying conditions of the patients, Ms. Embley requested the delay time be increased. She believed that this request was made after the accident.
No one witnessed the accident, but Ms. Embley was one of the first people to respond to the accident. Ms. Embley said that she was seated at a desk and heard something that sounded like someone fell. She recalled seeing Ms. Cornman, who was using a walker, on the ground.
Ms. Embley identified the "Event Information" report generated by the Hospital that was introduced into evidence. The report, made in March 2006, recites the general facts as narrated by Mrs. Graff and Ms. Cornman. After the recitation of these facts, the report stated, "Hang time was extended on the exit door."
Later in the report, the risk manager for the hospital, Sharon Pattison, commented, in May 2006, "The wellness Center staff and maintenance have been involved in this issue. These doors will be replaced by ones that have a sensor as I understand it, and not ones that open when the button is pressed." Added to that report were hospital work orders. Dated subsequent to the accident, the reports variously stated that the hang time for the side entrance needed to be increased (February 13, 2006); two orders dated March 13, 2006, that the doors were closing too fast and hitting members/patients while they were still walking through the doorway; another that the door sporadically opens when push button is pressed (March 16); and finally another report dated September 12, 2007, noting that the automatic door on the left side of the hallway was leaking fluid "not opening all the way, as well as closing pre-maturely on members."
Ms. Embley testified that, because of the accident, the staff began to help persons who were very slow through the door. She later stated that she did not recall any problems with the door before the accident. Ms. Ream discussed another incident with her that Ms. Embley thought "might" have occurred after the accident, but Ms. Embley was uncertain as to when it actually happened. "Near misses" did not generate accident reports. Typically, the doors gave enough time for one person to pass through.
Tim Borgardt, owner of Door Controls, Inc. who worked on the door in question, testified that the Hospital contracts with him to service doors on a "per call" basis. Ninety percent of his work involves automatic doors. Before and at the time of the accident, the doors had a low-energy electric hydraulic operator. The door consists of swinging doors that open outward and then return to a closed position. The door had a timer that was set to open for a predetermined time delay. The door, however, also operated just as any other manual door in that a spring closed the door. The door did not close under electric power. Thus, a person could exit either manually or through the automatic feature. In the automatic feature, once the door begins to close, a person would need to manually re-open the door by using physical or kinetic force. If the door closed after the predetermined time delay, a person assisting someone holding a walker would be unable to make the door reopen automatically. *689 He did not recall the time delay, but estimated that it was approximately the "normal" time of fifteen seconds.
Mr. Borgardt testified that, in September 2006, a different operating system was installed. This consisted of a safety sensor package, mats, and a motion sensor. Although the new system would be safer for one-legged people than the low-energy operating system, this did not mean that the low-energy operating automatic door was defective or that its design was not good for the use for which it was intended. As the door currently exists, it will not close on a person.

INVOLUNTARY DISMISSAL
The present matter actually involves an involuntary dismissal under La. C.C.P. art. 1672:
B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
The standard of review of an involuntary dismissal was stated by this Court as follows:
When a motion for dismissal at the close of the plaintiffs evidence is made, the trial court should apply the preponderance of evidence standard in weighing and evaluating the evidence.
Proof by a preponderance of the evidence means that, taking the evidence as a whole, such proof shows that a fact sought to be proved is more probable than not. .... Under article 1672, the trial judge may grant a motion for involuntary dismissal when the plaintiff has failed to show a right to relief. .... In non-jury trials, the appropriate standard for the trial court's determination of a motion to dismiss pursuant to art. 1672(B) is whether the plaintiff has presented sufficient evidence to establish his claim by a preponderance of the evidence. Our review of the trial court's determination is based on the manifest error standard....[1]

HEARSAY
During Ms. Cornman's direct examination, Mrs. Graffs counsel attempted to elicit testimony that, after the accident, Ms. Ream told Ms. Cornman that the staff was worried about the door prematurely closing on people and there were such instances that occurred before the accident. Specifically, counsel asked whether, after the accident, Ms. Cornman discussed the accident with Ms. Ream. Ms. Cornman replied, "Well, you know, the day that I fell, [Ms. Ream] mentioned that that had happened[.]" The Hospital objected on the basis of hearsay.
The trial judge sustained the Hospital's objection to hearsay testimony and allowed Mrs. Graff to make a proffer of proof outside of the presence of the judge. Mrs. Graff argues that the trial court erred by refusing to allow the testimony.
On the proffer, Ms. Cornman testified that she spoke to Ms. Ream on the date of the accident and afterwards. When asked whether Ms. Ream told Ms. Cornman that, *690 after this accident occurred, the employees were having problems with the doors in question, she replied affirmatively. Ms. Cornman testified that Ms. Ream told her that the employees were worried about those doors because, on three occasions, the doors closed on people. Mrs. Graffs counsel next inquired, "And she explained to you that they had had that problem before this accident?" Ms. Cornman replied, "Right."
Mrs. Graff argued in court and on appeal that the statements were admissible as an exception to the hearsay rule; namely, a declaration against interest by the Hospital's employee. She also argued that Ms. Ream, who was present in court to testify, could be questioned and cross-examined regarding her statements.
Ms. Ream testified that she did not recall telling Ms. Cornman that there had been problems with the door before her accident.
Q. Do you recall her [Mrs. Cornman] tellingdo you recall telling her that you all had been having problems with this door before their accident?
A. I don't recall.
Q. And if she testified that is what you had told her, there wouldn't be nor [sic] reason for you to disagree because you don't recall, do you?
A. I don't recall, no.
On review, it appears that the testimony at issue was not hearsay under La. C.E. 801(D)(3)(a):
D. Statements which are not hearsay. A statement is not hearsay if:
....
(3) Relational and privity admissions. The statement is offered against a party, and the statement is:
(a) A statement by an agent or employee of the party against whom it is offered, concerning a matter within the scope of his agency or employment, made during the existence of the relationship[.]
(Emphasis as found in the original.)
The substance of the proffered statement was put before the court on Mrs. Graffs direct examination of Ms. Ream. Thus, regardless of the applicability of La. C.E. art. 801(D)(3)(a), there is nothing in the proffered testimony that would change the outcome of the case had it been allowed in.

LIABILITY
Regarding the claims against the Hospital, the pertinent legal principles are somewhat different insofar as tort claims may be pursued against the public entity under La. C.C. art. 2317 and La. R.S. 9:2800 strict liability, as well as in negligence pursuant to La. C.C. art. 2315.[2] When addressing an action under either theory, the legal analysis is the same. The plaintiff bears the burden of showing that: (1) the public entity had custody of the thing that caused the plaintiffs injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) the public entity had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiffs injuries.[3] To recover, a plaintiff bears the burden of proving *691 all of these inquiries in the affirmative and failure on any one is fatal to the case.[4]
In the present case, Mrs. Graff failed to prove by a preponderance of evidence that the Hospital had actual or constructive notice of any defect that created an unreasonable risk of harm in the door. Neither Ms. Ream nor Ms. Embley testified that, prior to the Graff incident, the door had operated in such a manner as to cause or nearly cause injury or harm to any patients. The testimony was, at best, equivocal on that issue. There was no evidence that any repairs made to the door prior to the incident involved premature closure so as to put the Hospital on notice of any serious problem. According to Mr. Borgardt, the fact that a safety sensor was ultimately installed did not equate to a defect in the previous door.
Constructive notice as it relates to actions against a public entity is defined as the existence of facts which infer actual knowledge. Constructive notice can be found if the conditions which caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury.[5] There has been no showing by Mrs. Graff that would meet this standard and, thus, she has failed to prove an essential element of her case by a preponderance of the evidence.
For the foregoing reasons, we find no error in the determination by the trial court granting involuntary dismissal, and the judgment is affirmed.
AFFIRMED.
WICKER, J., dissenting with reasons.
I respectfully dissent, believing that the majority is incorrect in two respects.
First, I cannot subscribe to the theory that Ms. Cornman's excluded statements would not change the outcome.
In my view, the statements were significant because they were probative of a central issue in the casewhether the Hospital had notice of the alleged dangerous condition. At this point in the proceedings, the excluded testimony was not cumulative evidence. Furthermore, the statements were not hearsay under La. C.E. art. 801(D)(3)(a), and the trial judge abused her discretion in refusing to allow the testimony.
Second, in my opinion, the majority discounts Ms. Embley's deposition testimony that was introduced into evidence.
In this connection a portion of Ms. Embley's testimony recounting the history of pre-accident "near misses" is impressive. She was aware that their population consisted of "some people that were slower" or people who "would just stop walking." She testified that as a result, "we had concerns about the doors about the time." She stated: "[t]he door would start to close and it would worry us." Although Ms. Embley "saw that as a problem," she minimized its importance by stating: "[b]ut as far as people saying, you know, the doors attacked me or something went crazy with the doors, not really, not besides not opening when you pushed the button." Ms. Embley's testimony indicates that unless the door was broken or there was an accident resulting in injury, the door was considered safe.
*692 Thus, the testimonyread in its entiretyestablishes that after the accident the potential danger described above was no longer minimized.
The testimony also establishes that Ms. Embley was aware that some patients might need assistance to move safely out of the doors. And, according to Mr. Borgardt, if the door closed after the predetermined time delay, a person assisting someone holding a walker would be unable to make the door reopen automatically. According to Ms. Embley, it was unlikely that someone could manually open both doors. She explained that a person's arms could not be extended to the degree necessary to open the doors.
Consequently, the Hospital had pre-accident notice that the premature closing could result in a malfunctioning door that would potentially cause an accident such as the present one. Although there had been substantial use of the door without any prior accidentand there had been no change from its condition from the rehabilitation unit's move to the date of the accidentthe premature closing of the door in this case was not an unexpected event. Hence, the Hospital was required to anticipate or guard against the hazard.
For the above reasons, I would reverse the judgment of the trial court dismissing the plaintiffs' suit; overrule the granting of the motion for involuntary dismissal; reverse the trial judge's ruling sustaining the hearsay objection and render judgment overruling the hearsay objection; and, remand the case to the trial court for a completion of a trial on the merits. On remand, the Hospital would have the opportunity to present countervailing evidence at a full trial of this matter.
NOTES
[1] Gordon v. State Farm Ins. Co., 97-270 (La. App. 5 Cir. 9/30/97), 700 So.2d 1117, 1118 (citations omitted).
[2] Fontenot v. Patterson Ins., 09-0669 (La. 10/20/09) 23 So.3d 259 (citing Henderson v. Nissan Motor Corp., 03-0606 (La.2/6/04), 869 So.2d 62).
[3] Id.
[4] Netecke v. State ex rel. Dep't of Transp. and Dev., 98-1182, 98-1197 (La.10/19/99), 747 So.2d 489.
[5] Jeansonne v. S. Cent. Bell Tele. Co., 08-568 (La.App. 5 Cir. 1/13/09), 8 So.3d 613.