DREW, J.
 

 hln this personal injury lawsuit arising from a collision between a motorist and a horse on 1-20 in Madison Parish, the Louisiana Department of Transportation and Development (“DOTD”) appeals a judgment finding it 50% at fault and awarding over $800,000 in damages. The motorist, Douglas Schysm, also appeals the judg
 
 *979
 
 ment, contending that the jury erred in not awarding damages for loss of earning capacity and for future mental and physical pain and suffering.
 

 We reverse the judgment insofar as DOTD was found liable for any damages. In all other respects, the judgment is AFFIRMED.
 

 FACTS
 

 Schysm, a resident of Arkansas, was employed as a scaffolding supervisor. He worked on assignments building scaffolding at various paper mills, refineries, and energy plants throughout the country. On February 22, 2003, Schysm worked from 7:30 a.m. until 5:30 p.m. at a power plant in Vicksburg, Mississippi. He returned to his hotel after work, showered and changed clothes, then drove to a Wal-Mart. After leaving Wal-Mart, Schysm went to a Ryan’s restaurant, where he arrived at 8:45 and began dining on the buffet. Schysm left the restaurant at approximately 10:00 p.m. Schysm drove his company pickup truck around Vicksburg, then proceeded to the Isle of Capri casino in Vicksburg. He arrived at the casino at approximately 11:00 p.m.
 

 Schysm did not gamble while at the casino. Instead, he drank three Coors Light beers and watched strangers gamble. It was past 1:00 a.m. when he left the casino to return to his hotel. Schysm intended to take 1-20 12east, but because he was unfamiliar with Vicksburg’s roads, he mistakenly entered a loop that put him on 1-20 heading west. Schysm crossed the Mississippi River into Louisiana, took the first exit at Delta, returned to 1-20, and began heading back east toward Vicksburg.
 

 Meanwhile, Charles Bodin was driving east in the right lane on 1-20. As he neared the community of Delta, Louisiana, and the foot of the bridge over the Mississippi River, a horse named “Chance” ran into the driver side of Bodin’s car. Bodin stopped his vehicle, then backed up his car on the Interstate shoulder so he could direct his headlights at Chance’s body, which was lying in the right lane. After calling 9-1-1 to report the accident, Bodin turned on his emergency flashers and exited his vehicle so that he could alert oncoming drivers about the dangerous situation. An 18-wheeler was able to swerve from the right lane into the left lane to avoid hitting Chance. Schysm, who was following, was not so fortunate.
 

 Schysm’s truck struck the horse, went airborne, and eventually landed upside down next to a guardrail on the bridge approach. It was estimated that his truck traveled 245 feet. Chance was moved about 86 feet and ended up on the right shoulder of the road.
 

 Louisiana State Police Trooper Robert Patrick was dispatched to the accident scene at 2:00 a.m. He estimated the time of the accident was 1:58 a.m. Paramedic Tammy Giger was dispatched at 2:07 a.m. and arrived at 2:26 a.m.
 

 Schysm sustained a serious injury to his left upper arm. He fractured his humerus, and damaged the brachial artery, median nerve, and medial Rantecubital cutaneous nerve. Giger saw parts of the broken bone sticking out of his arm. Schysm also had an abrasion to his forehead and a broken rib.
 

 Schysm was transported by ambulance to the Emergency Room at River Region Hospital in Vicksburg. His blood was tested there at 3:10 a.m., showing a blood alcohol content (“BAC”) at that time of G.092%.
 
 [1]
 
 Because of the severity of
 
 *980
 
 Schysm’s injuries he was transported to University Medical Center in Jackson, Mississippi. An external fixator was surgically placed to repair his broken humerus, and a vein was grafted from his leg to repair the damaged brachial artery. Schysm was discharged from the hospital on March 1, 2003.
 

 Schysm filed suit against Penny Towne,
 
 [2]
 
 who was thought to own the property where Chance’s pen was located; Joseph and Kim Boyd, who owned Chance; and American Home Assurance Company, which provided homeowners insurance to the Boyds. The petition was amended to add the DOTD as a defendant. Schysm asserted that DOTD failed to inspect and maintain a fence along 1-20, allowed the fence to be cut for easier vehicle access, and failed to warn motorists that the cut fence would allow animals to roam free. Schysm dismissed his claim against American Home Assurance Company.
 

 |4DOTD filed an answer which raised the issue of Schysm’s fault as well as the fault of the Boyds. DOTD also filed a cross-claim against the Boyds and Towne. The Boyds filed an answer and a cross-claim against DOTD.
 

 The jury found that Schysm’s BAC was not .10% or higher at the time of the accident, and assigned fault as follows: 50% to DOTD, 30% to the Boyds, and 20% to Schysm. The jury awarded damages totaling $884,062. The damages were: $275,000 for past physical pain and suffering, $25,000 for past mental pain and suffering, $90,000 for past medical expenses, $119,062 for past loss of wages, $275,000 for loss of enjoyment of life, and $100,000 for disability. The jury awarded no damages for future mental and physical pain and suffering, future medical expenses, or loss of future wages and/or earning capacity. DOTD moved for a JNOV and, in the alternative, a new trial. The motions were denied.
 

 DOTD has appealed, contending that it is free from fault for Schysm’s accident. DOTD argues in the alternative that its percentage of fault should be reduced with the Boyds bearing the brunt of the fault, and with Schysm’s percentage of fault also being increased. DOTD further contends that the total of $650,000 awarded in general damages for past physical pain and suffering, loss of enjoyment of life and disability was excessive.
 

 Schysm has also appealed, arguing that the jury erred in not awarding damages for loss of earning capacity and for future mental and physical pain and suffering.
 

 I «DISCUSSION
 

 An appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Cole v. Department of Public Safety & Corrections,
 
 2001-2123 (La.9/4/02), 825 So.2d 1134;
 
 Stobart v. State through Dept. of Transp. and Development,
 
 617 So.2d 880 (La.1993). To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong.
 
 Stobart, supra.
 

 
 *981
 
 Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.
 
 Cole, supra; Rosell v. ESCO,
 
 549 So.2d 840 (La.1989).
 

 The Boyds’ Liability
 

 Kim and Joseph Boyd have two children, Heather Haynes and Thomas Haynes. Thomas and Joseph were not living in Delta at the time of the accident. Thomas was away at a National Guard youth program in Gonzales, Louisiana, and Joseph was working in Florida. In their absence, Kim and Heather were responsible for Chance’s upkeep.
 

 Chance was a cutting horse purchased by the Boyds when he was eight months old. Chance and an older horse, who died before Chance met Rhis untimely end, were originally kept in a pen that the Boyds had built near their Delta home. They were later moved to a larger pen closer to Penny Towne’s home. The larger pen had a barbed wire gate which Joseph replaced with an aluminum gate. This gate was tied closed with a rope, and then a chain was looped around a post. The gate was not padlocked, and it was believed that Chance could not nudge the gate open.
 

 Joseph Boyd was experienced in fence building. Before moving the horses into the new pen, he checked the fence to make sure it was in proper condition, and he made any necessary repairs. The other family members were also capable of fence repairs. Chance was apparently a well-kept horse.
 

 La. R.S. 3:2803 states, “No person owning livestock shall knowingly, willfully, or negligently permit his livestock to go at large upon” public highways named in the statute. 1-20 is not included among the public highways enumerated in that statute. Nevertheless, La. R.S. 32:263(A) provides, “No person owning live stock, as defined in R.S. 3:2802, or having same under his care and control, shall knowingly, willfully or negligently permit such live stock to go upon any Louisiana interstate highway.” A horse is defined as “livestock” in La. R.S. 3:2802.
 

 It is well settled from the jurisprudence interpreting La. R.S. 3:2803 that when an automobile strikes a horse on one of the enumerated “stock law” highways, the burden of proof rests upon the owner of the horse to exculpate himself from even the slightest degree of negligence. To rebut the legal presumption of negligence or fault, the owner must establish that 17he has taken all reasonable and prudent measures and precautions to enclose his horse and must also explain the presence of the horse on the highway by showing when, where, and how the horse escaped from its enclosure, that is, his complete freedom from fault.
 
 Hines v. Garrett,
 
 2004-0806 (La.6/25/04), 876 So.2d 764;
 
 Austin v. Bundrick,
 
 41,064 (La.App.2d Cir.6/30/06), 935 So.2d 836.
 

 This burden of proof placed upon an owner of livestock that has escaped onto Louisiana’s enumerated “stock law” highways is applicable to the owner of livestock that has escaped onto Louisiana’s Interstate highways. The jury obviously found that the Boyds did not meet this burden of proof as they were allocated 30% of the fault for the accident.
 

 The fence around Chance’s pasture was repaired as needed, and not just after Chance made one of his escapes. These efforts were obviously not sufficient as Chance escaped from his pen at least five times, apparently usually through a broken or cut wire on the fence, although Kim testified that on one occasion his gate was
 
 *982
 
 left open. Neighborhood children were sometimes discovered in or around Chance’s pen.
 

 Chance, who was fearful of cars, had never previously escaped to 1-20. Near a canal, behind his pen, and next to Towne’s home were some of the places that Chance was discovered after escaping. None of the Boyds knew how Chance had escaped from his pen that fateful night. He did not have a reputation of being a jumper.
 

 |
 
 ^Schysm
 
 ⅛
 
 Liability
 

 Although the jury specifically found that Schysm’s BAC was not 0.10% or higher at the time of the accident, he was nevertheless found to be 20% at fault for the accident.
 

 The two eyewitnesses to the accident, Charles Bodin and Charles Hussey, had somewhat different accounts of exactly how the accident occurred.
 

 Bodin, a boat captain, was traveling that night from his home in Texas to pick up a crew member in Vicksburg, and then on to Memphis, Tennessee. Following the collision between Chance and his car, Bodin backed up his car so that it was about 30 feet behind Chance. He turned on his emergency flashers and tried to direct his headlights at Chance. Bodin exited his vehicle, stood between his car and the right lane and waved his arms to alert oncoming motorists.
 

 After an 18-wheeler successfully passed him, Bodin saw Schysm’s truck, which he described as traveling fast. He could hear the engine in Schysm’s truck, and even though he did not hear the engine “rev up,” it sounded to Bodin that Schysm was keeping a steady speed. Although Bodin did not think Schysm was driving erratically, he saw Schysm drive the truck straight at Chance. Bodin recalled that Schysm could have changed lanes because no vehicle was present in the left lane to prevent him from doing so. Bodin could not tell if Schysm applied his brakes, but he did not think that Schysm slowed down. Bodin saw Schysm’s truck go airborne, flip over and then skid over to the guardrail. Bodin did not see 19another vehicle in front of Schysm, and he did not see Schysm pass an 18-wheeler.
 

 Hussey was a cross-country trucker driving his 18-wheeler east on 1-20 on the night of the accident. He was familiar with the road as he often drove on 1-20 through Louisiana. Hussey exited a weigh station, reentered 1-20, and headed toward the bridge. He saw signs indicating that construction was ahead on the bridge and that the speed would be reduced, so he pulled his truck into the left lane and slowed down to 45 mph. In the distance, he could see Bodin’s car with its hazard lights flashing. A car and then Schysm’s truck sped past Hussey’s truck in the right lane and entered the left lane. As he saw Schysm’s truck and the car go past Bodin’s car, the truck moved partially into the right lane as if to pass the car. Hussey next saw Schysm’s truck brake, suddenly lurch to the left, and then hit the concrete median. The truck flipped and landed upside down against the guardrail along the right shoulder.
 

 Schysm recalled seeing Hussey’s truck and a car, and he passed Hussey because he was driving below the speed limit. Trooper Patrick recorded the speed limit in the area as 70 mph, and he had no indication that Schysm was speeding.
 

 The area where the accident occurred was dark. There were no Interstate lights directly overhead. The closest fighting was from the weigh station and the bridge, but that did not illuminate the area. Bo-din was unsure to what extent his headlights made Chance visible to other drivers. Hussey did not think that Bodin’s headlights were shining on Chance.
 

 
 *983
 
 I inTrooper Patrick noted a strong odor of alcohol on Schysm’s breath and in his truck. Trooper Patrick also found open beer cans at the accident scene. Bodin claimed that he smelled alcohol, but thought the odor was coming from the truck. He also heard Schysm say that another person had been driving his truck.
 

 Hussey, who cut Schysm’s seatbelt so he could exit his truck, never smelled alcohol or saw any beer cans. Hussey recalled that Schysm kept asking where someone was, but he never heard Schysm say that someone else had been in the truck with him. Hussey thought Schysm was in shock.
 

 Giger, the paramedic, did not smell alcohol on Schysm’s person at any time, including when she examined him in the back of the ambulance. Giger believed that she saw a beer can near his truck, but Schysm answered in the negative when Giger asked him if he had any alcohol in his truck. Giger thought his speech was slow, but not slurred. Schysm was unable to tell Giger where he was, where he was going, or what time of day it was, but she associated this condition with a head injury.
 

 Schysm denied being impaired at the time of the accident. He estimated he had his first beer at about 11:20 p.m., followed by a second one 45 minutes later. He stated that he did not have a beer when he left the casino, and denied having any beer in the truck. Schysm denied stopping to buy beer while driving around that night.
 

 Dr. Ernest Lykissa testified as an expert in toxicology. Dr. Lykissa questioned the accuracy of Schysm’s BAC measured at the hospital because the intent of that test was to detect the presence of alcohol for treatment |npurposes. Dr. Lykissa thought a gas chromatogram test would have been more reliable to determine Schysm’s true BAC. Dr. Lykissa estimated that Schysm had a BAC between 0.04 and 0.07% at the time of the accident. He believed that Schysm left the casino with a BAC that was 0.04% and rising, and that it continued to rise until he was tested at the hospital.
 

 Dr. Lykissa explained that the food eaten by Schysm at Ryan’s delayed the absorption of alcohol and caused the BAC to rise slowly. In addition, Dr. Lykissa thought that what happened after the accident affected the BAC. Schysm lost nearly half his blood volume, and his liver responded to this loss of blood by pushing blood containing alcohol back into the bloodstream. Schysm’s blood was also compromised for purposes of measuring BAC by the release of lactic acid from the trauma he suffered, as well as dilution from the IV fluids he received. Finally, Dr. Lykissa concluded that three beers drunk consecutively would raise the BAC to only 0.075%.
 

 Dr. Lykissa agreed that Schysm would have been significantly impaired if his BAC was 0.07% at the time of the accident. At that BAC, Schysm would have experienced mild influence of stereoscopic vision, which would have affected his depth perception, and the ability of his eyes to adapt to the dark would have been affected.
 

 Dr. Tom Arnold testified as an expert in emergency medicine and medical toxicology. He opined that Schysm’s BAC at the time of the accident was between 0.107 and 0.110%. Dr. Arnold contended that the large loss of blood volume would not have considerably changed the BAC, 11Pand that any physiological changes caused by blood loss would have been countered by dilution from the IV fluids that Schysm received in the ambulance.
 

 Dr. Arnold also noted that Schysm had last eaten at 10:00 p.m. He argued that
 
 *984
 
 meal was far enough in advance of the accident that the effect of the food on the absorption of alcohol was negligible. There would not be a continued delay of alcohol absorption several hours later. Dr. Arnold disagreed that Schysm’s BAC was still rising at the time it was measured. Dr. Arnold thought the BAC was higher an hour earlier and was on its way down when measured. Dr. Arnold also thought that Schysm would have had to consume more than the three beers at the casino in order to get even the 0.092% BAC measurement at the hospital.
 

 Dr. Arnold argued that there is impairment of vision and dark adaptation when the BAC is as low as 0.05%. He believed that Schysm was impaired at the time of the accident.
 

 Duaine Evans testified as an expert in accident reconstruction and traffic engineering. He explained that a vehicle’s headlights illuminate a distance of approximately 150 feet when on low beam. He also stated that using a reaction time of 2.5 seconds, which Evans thought was the reaction time at night, the braking distance when traveling at 70 mph is 490 feet.
 

 Evans opined that the accident was unavoidable on the part of Schysm because it was difficult for oncoming drivers to see Chance lying on the pavement. It was dark, and Schysm would not have expected to see a |13horse on the road. In addition, Evans felt that Bodin’s emergency flashers may have been more of a distraction to Schysm than an aid.
 

 Evans admitted that he does not evaluate the effects of alcohol. He would not say that alcohol may have been a cause of Schysm’s accident, but only that it may have played a part.
 

 Kelly Adamson testified as an expert in traffic design, traffic maintenance, occupant kinematics, and accident reconstruction. Adamson opined that the accident was consistent with a driver being inattentive to the forward view because Schysm should have had a heightened level of awareness when he saw the hazard lights flashing and Bodin waving. A cautious driver would have slowed down and moved into the left lane. Adamson believed that Schysm could have avoided Chance altogether or at least struck him at a slower speed had he seen, perceived, and reacted to the horse in the road. He noted that an 18-wheeler was able to change lanes and avoid hitting Chance.
 

 Adamson recalled that the area where the accident occurred was so dark that he did not use his light meter to measure the light when he visited the site in 2008. He agreed that a driver traveling 70 mph at night might hit an object before he even has a chance to react.
 
 [3]
 
 He also agreed that most people driving 50 mph at night would have trouble avoiding a horse in the roadway. He noted, however, that Schysm had the benefit of the flashers on Bodin’s car to alert him to the danger, Bodin’s lights were somewhat | ^illuminating the horse, and Chance’s reddish brown coat would have contrasted with the light gray concrete road.
 

 Adamson thought it was more probable than not that Schysm’s reaction time was delayed. He had been awake for nearly 20 hours and had been drinking. Adamson thought the cause of the accident was Schysm’s failure to see, perceive, and react.
 

 DOTD’s Liability
 

 Schysm had the burden of showing that: (1) DOTD had custody of the
 
 *985
 
 thing that caused his injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (B) the DOTD had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiffs injuries.
 
 Fontenot v. Patterson Ins.,
 
 2009-0669 (La.10/20/09), 23 So.3d 259.
 

 The duty placed upon DOTD was discussed in
 
 Fontenot:
 

 The primary duty of the DOTD is to continually maintain the public roadways in a condition that is reasonably safe and does not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. It is the DOTD’s knowledge, constructive or actual, which gives rise to the obligation to take adequate measures necessary to prevent injury. Notably, the DOTD’s duty of care extends not only to prudent and attentive drivers, but also to motorists who are slightly exceeding the speed limit or momentarily inattentive.
 

 Nonetheless, this Court is also cognizant that the DOTD is not a guarantor of the safety of all the motoring public under every circumstance. Nor is the DOTD the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the roadway. This Court has also held that the DOTD’s failure to design or maintain the state’s highways to modern standards does not establish the existence of a hazardous defect in and of itself. In other words, we will not | ^impose liability for every imperfection or irregularity, but only a condition that could reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. Whether the DOTD breached its duty, that is, whether the intersection was in an unreasonably dangerous condition is a question of fact and will depend on the facts and circumstances of each case.
 

 Id.,
 
 2009-0669 at pp. 15-16, 23 So.3d at 270-271 (citations omitted).
 

 In determining whether a defect presents an unreasonable risk of harm, the trier of fact must balance the gravity and risk of harm against the individual and societal rights and obligations, the social utility, and the cost and feasibility of repair.
 
 Reed v. Wal-Mart Stores, Inc.,
 
 1997-1174 (La.3/4/98), 708 So.2d 362.
 

 The record is replete with testimony about two areas in Delta where DOTD either did not maintain a fence or did not erect one in the first place. This first area (the “Arnold gap”) is located behind the home of the Arnold family, who live on Stafford Drive, which runs south of and parallel to 1-20. The Arnolds’ backyard extends to the right-of-way on 1-20. Residents could not recall there ever being a fence separating the backyard from 1-20. If a fence had been erected there, it had been missing for 20 to 30 years. Tammy Cuttrell, who lived near the Arnolds, testified that sometime after 2000, she observed someone attempt to drive onto 1-20 through the Arnold gap before being stopped by Mrs. Arnold.
 

 The second area (the “Blakely gap”) is located about 200 feet east of the Arnold gap and is closer to the beginning of the bridge guardrail. It is directly behind the home of the Blakelys. It is also closer to where Chance first ran into Bodin’s vehicle. There was a fence at this gap at one point, but | lfiwhen the Highway 80 bridge was closed in 1999, the fence was cut, and motorists began to drive through the gap so they could illegally access 1-20 and avoid taking the longer, legal route. It was a frequently used shortcut. Cuttrell saw state workers driving through the
 
 *986
 
 Blakely gap between 2002 and 2004 when mowing grass or working on 1-20.
 

 The fence at the Blakely gap was apparently repaired, then soon cut again by drivers. After the accident at issue, signposts were put into the ground to prevent motorists from driving through it. Additional steps later taken by DOTD at this site included making ditches in the area deeper and building a berm.
 

 Robert Matthews worked for DOTD for 32 years and was employed as a parish maintenance supervisor in Madison Parish for 18 of those years. His responsibility was to ride the state roads in Madison Parish at least once every two weeks checking on what maintenance work needed to be done. Matthews estimated that he traveled 1-20 in Madison Parish an average of five to six times each two-week period. If Matthews noticed a fence was down, he would try to get it repaired as soon as possible.
 

 A couple of times Matthews noticed motorists using a gap in a fence to access I-20 and head east, apparently at the Blakely gap. He alerted the Delta Police Department that it was happening. Matthews had also noticed the lack of a fence at the Arnold gap.
 

 Major James, Jr., has been a DOTD employee in Madison Parish for 16 years. He has worked as a Highway Foreman 1 for eight years. His job is to maintain roads, ditches, and rights-of-way. He repaired fences along 117I — 20, and if he received notice that a fence along 1-20 was knocked down, he would have the fence repaired or at least install signposts to prevent traffic from going through it until the fence could be replaced. James admitted that he would want to fix a downed fence in an area along 1-20 where he knew livestock were kept.
 

 Tommy Dunning worked for DOTD for 36 years, including seven years as a Parish Maintenance Specialist. He supervised the maintenance of state roads in three parishes, including Madison Parish. DOTD had 14 employees involved in maintenance of Madison Parish roads at the time of the accident.
 

 Dunning stated that if he noticed that a fence was down along 1-20, he would have scheduled a repair. He added that if he saw cars illegally accessing 1-20, he would try to fix the problem or contact local law enforcement.
 

 Dunning visited the accident scene the night of the accident and the next day. He thought the fence was leaning but was not in bad shape. He did not see any hazards that he thought needed to be fixed.
 

 Duaine Evans, the expert in accident reconstruction and traffic engineering, explained that the American Association of State Highway and Transportation Officials (“AASHTO”) publishes design guides. The guide in effect at the time a highway is designed is the one used. Evans stated that in this instance, the 1965 edition was applicable because this section of 1-20 was designed prior to the publication of the next guide.
 

 11sThe 1965 edition of AASHTO’s
 
 [4]
 
 “Policy on Geometric Design of Rural Highways” stated under the heading of “Fencing”:
 

 Fencing along a highway is a means of preventing unwanted and likely hazardous intrusion of animals, people, vehicles, machines, etc., from outside the right-of-way line into the vicinity of mov
 
 *987
 
 ing traffic. In many cases the abutting property owner erects and maintains such a fence and when so satisfactorily accomplished the highway agencies have no need to be concerned with fencing. In other cases the landowner has little or no interest, or perhaps no legal concern, and a fence where needed must be provided as part of the highway facility. On controlled access highways, drivers travel at high speeds expecting complete protection from all forms of roadside interference. This makes fencing essential as an integral part of the highway wherever there is a potential hazard through encroachment. To the extent that a fence is needed and an appropriate type is not provided and maintained by the abutting landowner, the highway agency should erect and maintain it. All portions of a controlled access highway do not necessarily require fencing as there are sections where there is little or no warrant for fences. But wherever the safety of freeway operation requires fencing, it should be considered as an essential part of the total highway facility, constructed as a highway item if not otherwise provided.
 

 Reference should be made to AASHO Policy on Fencing Controlled Access Highways, 1959, for general principles applicable to the utilization and placement of fences along freeways.
 

 Evans believed that an area where cows and horses were being kept is an area requiring fencing along an Interstate. Evans also believed that a fence should have been erected and maintained along 1-20 near Delta. The fence called for by DOTD would have been five feet in height, with a lower portion of net wire and two or three strands of barbed wire at the top. Evans opined that if a fence had been present, it was more likely than not |19that Chance would not have gotten onto 1-20. Evans also opined that the absence of the fence, along with the Boyds’ failure to keep Chance constrained, were the causes of the accident.
 

 Evans concluded that the state assumed responsibility when it erected a fence. He added that DOTD failed its duty to protect motorists if the fence had been down for more than 20 years.
 

 Kelly Adamson, the expert in traffic design, traffic maintenance, occupant kinematics, and accident reconstruction, explained that there are separate AASHTO design and maintenance guidelines. Adamson testified that the 1965 guidelines were inapplicable at the time of the accident because that portion of 1-20 had been reconstructed in 2002.
 

 Adamson explained that the area of 1-20 where the accident occurred is a bridge abutment section that was redesigned when the approach line of the bridge was changed, which modified the horizontal-vertical alignment of the roadway. The road had also been resurfaced. When a bridge is changed, the approach slab section, which goes out for several hundred feet, also has to change.
 

 Adamson stated that actually applicable here was the 2001 edition of AASHTO’s “Policy on Geometric Design of Highways and Streets,” which stated, under the heading of “Fencing”:
 

 Highway agencies use fencing extensively to delineate the acquired control of access for a highway. While provision of fencing is not a duty, fencing may also serve to reduce the likelihood of encroachment onto the highway right-of-way.
 

 Any portion of a highway with full control of access may be fenced except in areas of precipitous slopes, natural barriers, or where it can be established that fencing is not needed to | ^preserve ac
 
 *988
 
 cess control. Fencing is usually located at or near the right-of-way line or, where frontage roads are used, in the area between the through highway and the frontage road (outer separation).
 

 Fencing for access control is usually owned by the highway agency so that the agency has control of the type and location of fence. The lowest cost type of fence best suited to the specific adjacent land use is generally provided. If fencing is not needed for access control, the fence should be the property of the adjacent landowner.
 

 The Foreword of this publication states, in relevant part:
 

 This publication is not intended as a policy for resurfacing, restoration, or rehabilitation (3R) projects. For projects of this type, where major revisions to horizontal or vertical curvature are not necessary or practical, existing design values may be retained.
 

 Adamson explained that the purpose of the fencing along 1-20 was to control vehicular access, not to keep livestock off the Interstate. There was no duty under the 2001 AASHTO guidelines to have a fence along 1-20, and there was no need for a fence along an adjacent backyard in order to control access. Adamson added that DOTD does not maintain livestock fencing.
 

 A 1990 publication from AASHTO, “An Informational Guide on Fencing Controlled Access Highways,” states in relevant parts:
 

 Introduction
 

 Fencing along a highway is a means of preventing unwanted and likely intrusion of animals, people, vehicles, machines, etc., from outside the right-of-way line or access control line into the vicinity of moving traffic or onto the operating right-of-way. This applies to both full or partial controlled facilities. The fencing along highways has generally grown from an adjacent owner responsibility to that of the highway agency. This change has occurred for many reasons, primarily for control of animal movement, pedestrian movement, and vehicle encroachment — all to maintain a safe environment for the highway user. _|2jControlled access highway operation ... makes fencing the responsibility of the highway agency. Fencing should be provided wherever there is potential encroachment. All portions of a controlled access highway should be continuously fenced unless it can be established that a fence is not warranted; such as in areas of precipitous slopes or natural barriers.
 

 Warrants
 

 The basic warrant for fencing a highway is safety of traffic movement. To this end, fencing is warranted for one or more of the following purposes:
 

 1. To keep animals off the highway.
 

 2. To keep children, pedestrians, and bicyclists off the highway.
 

 3. To prevent objects from being thrown onto a roadway from an ov-ercrossing structure.
 

 Adamson stated that under this warrants section, it is up to the district engineer to determine whether a fence is needed. He also noted that the language in the guidelines was suggestive, not mandatory.
 

 DOTD had actual or constructive notice that right-of-way fences were either in disrepair or nonexistent along portions of eastbound 1-20 near Delta. Nevertheless, if DOTD had assumed or had a duty to construct and maintain right-of-way fencing along that section of 1-20, that fencing was intended only to restrict vehicle access to and from 1-20. It was not intended to prevent a horse that had escaped from its pen from entering upon 1-20.
 

 
 *989
 
 Chance’s pen was not adjacent to 1-20, and it was estimated to be 350 to 400 feet from 1-20. In order to reach 1-20, Chance had to cross a ditch, a gravel road, a paved road, and a grassy area. No unreasonable risk of harm was created for motorists under these circumstances by DOTD’s failure to maintain or erect a right-of-way fence in this stretch of 1-20.
 

 |⅞⅛
 
 State Farm Mut. Auto. Ins. Co. v. Slaydon,
 
 376 So.2d 97 (La.1979), the plaintiffs were injured when their van struck a wandering cow on a section of 1-59 that passed through the Honey Island Swamp. The barbed wire and hog wire right-of-way fence was broken or cut in many areas along that six-mile stretch of 1-59. In some areas, the fence was only two feet high. Cattle and other livestock were often found on the highway.
 
 [5]
 
 The trial court found that DOTD was negligent in failing to properly maintain fences and in allowing livestock to roam the Interstate without warning the public. The supreme court held that where DOTD had notice of persistent roaming livestock and failed to warn the motoring public, it breached its duty to maintain the Interstate in a reasonably safe condition.
 

 In the matter before us, there was no indication that there had been a prior problem with horses along that portion of 1-20. Trooper Patrick could not recall working another vehicle accident on that stretch of 1-20 involving a horse. Matthews was unaware of another horse getting on 1-20 in the Delta area. Cuttrell had never heard of another horse being struck by a vehicle on that stretch of 1-20.
 

 Major James testified that there had been incidents involving cows and horses on 1-20 in Madison Parish. However, he could not recall another incident of a horse being on 1-20 in the Delta area. Dunning could not recall any problems in the area of Delta concerning horses getting on 1-20 prior to the accident. He thought Chance was the only horse to get on 1-20 in the | gjDelta area. Heather Haynes could not recall any other horses from Delta getting on 1-20.
 

 Based upon our review of the record, we conclude that the jury was clearly wrong in finding that DOTD was at fault for the collision between Schysm and Chance.
 

 Damages
 

 The trier of fact has much discretion when assessing damages in cases of offenses, quasi offenses, and quasi contracts. La. C.C. art. 2324.1. Before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration.
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257 (La.1993). The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages.
 
 Eddy v. Litton,
 
 586 So.2d 670 (La.App. 2d Cir.1991),
 
 writ denied,
 
 590 So.2d 1203 (La.1992).
 

 The law on the loss of earning capacity was stated by the supreme court in
 
 Folse v. Fakouri,
 
 371 So.2d 1120, 1123-24 (La.1979):
 

 What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earn
 
 *990
 
 ing capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn.
 
 Coco v. Winston Industries, Inc.,
 
 341 So.2d 332 (La.1976). Damages should be estimated on the injured person’s ability to earn money, rather than what he actually earned before the injury.
 

 [[Image here]]
 

 ^Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
 

 An external fixator was surgically placed in Schysm’s arm on the date of the accident. On that same date, a vein was grafted from his leg to his upper arm to repair the brachial artery. Several days later, a catheter was inserted in his left femoral vein in his groin to provide IV access.
 

 Surgery was again performed on February 28, 2003, for debridement of the wound, to adjust the external fixator, and to evaluate the ulnar and median nerves. Schysm left the hospital at the beginning of March.
 

 On April 10, 2003, Schysm underwent a skin graft. The external fixator was surgically removed on May 19, 2003. Schysm underwent a nerve graft later that month. Another nerve graft was done on June 10, 2003. Later that June, an internal fixator was placed in his left humerus. That usually remains permanently in the arm.
 

 Schysm has a severe disability to his left arm. He was unable to fully bend his arm and hand for nearly a year and a half. It remains difficult to straighten his fingers, he cannot grip with the left hand, and he does not have feeling in that hand. The back of his lower left leg remains numb from where nerves were harvested.
 

 Schysm has experience working in construction trades such as carpentry, iron work, and boiler making. He has been working in the scaffolding trade since around 1994. He initially worked as a scaffold 12r,builder helper, then became a journeyman after a few years. He became a scaffolding supervisor in 2000, which was the position he was in at the time of the accident.
 

 Schysm did not remain idle after the accident. He received associate degrees in accounting and business management after 18 months of classes. Shortly before he was to begin an internship position, an acquaintance helped him obtain a position as a safety supervisor. Schysm attended a course lasting from January to April of 2005 at McNeese State University so he could obtain certification as a safety supervisor. He was able to start working in safety positions in January of 2005. He has worked as a safety supervisor/construction manager for his current employer since January of 2006.
 

 Schysm realizes that he has a good job as a safety supervisor, but explained that he lacks job security because a safety supervisor is required at a jobsite only when there are at least 25 workers present. He also added that he rarely receives overtime.
 

 In 2006, Schysm and a friend created an LLC to sell a line of sauces and marinades he developed. The products first went on the market at stores in 2008. Schysm asserted that he lost money on the business and eventually sold his interest to his partner.
 

 Jeff Peterson testified as an expert in vocational evaluation and vocational reha
 
 *991
 
 bilitation. He met with Schysm in June of 2008. Schysm did not tell Peterson about his business venture. Peterson noted that Schysm had a moderate but permanent vocational disability. He works as a safety | gfitechnician/construction manager in a job for a scaffolding company in a sheltered employment setting, which means that the position has been modified to exclude him from climbing. Since he has limited use of his left upper extremity, he cannot return to his pre-injury jobs. His injuries have caused his future earning capacity to decline and limited his range of job alternatives. Peterson contended that if Schysm lost his job, he will have a difficult time finding another job in a similar capacity in a sheltered employment setting at a similar pay rate. If he sought employment outside the construction industry, his annual earning capacity would be $30,200 to $35,400.
 

 At the time of trial, Schysm was earning $56,160 per year as a safety technician. He was making more than he did in 2002, although Peterson pointed out that the prevailing pay rate for scaffolding supervisors has risen since 2002. A scaffolding supervisor working overtime could earn between $72,400 and $84,900. Peterson estimated that Schysm will experience an income loss of between $12,800 to $25,650 per year.
 

 Dr. Charles Bettinger testified as an expert economist. He examined Schysm’s 2006 W-2 and earlier Social Security statements. He estimated Schysm’s earnings for 2007 and 2008. Dr. Bettinger had a letter from Schysm’s employer setting forth his current earnings, which were the highest they had ever been.
 

 Dr. Bettinger estimated a past loss of earnings of $119,062. He projected a loss of future earning capacity under four scenarios. In these four scenarios, Dr. Bet-tinger examined the difference between what Schysm |27wouId have earned in his pre-injury job but for the accident, and what he would earn in a post-injury job. These are the four scenarios:
 

 [[Image here]]
 

 The median between the scenarios is $838,721. He did not know about Schysm’s sauce and marinade business.
 

 Schysm’s quality of life suffered as a result of the accident. He can no longer play softball, and he has trouble golfing, hunting, and fishing. His wife left him after the accident, and he became dependent upon his young children, and especially upon his daughter, to help him with household chores.
 

 Based upon our review of this record, we cannot conclude that the jury abused its discretion in the general damages it awarded and denied.
 

 Allocation of Fault
 

 In determining percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages
 
 *992
 
 claimed.
 
 Watson v. State Farm Fire and Cas. Ins. Co.,
 
 469 So.2d 967 (La.1985).
 

 In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the [^conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
 
 Id.
 

 An appellate court must give great deference to the allocation of fault as determined by the trier of fact.
 
 Fontenot v. Patterson Ins., supra; Clement v. Frey,
 
 95-1119 (La.1/16/96), 666 So.2d 607. The allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and any allocation by the factfinder within that range cannot be clearly wrong.
 
 Fontenot, supra; Foley v. Entergy Louisiana, Inc.,
 
 2006-0983 (La.11/29/06), 946 So.2d 144. Only after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award.
 
 Fontenot, supra; Clement, supra.
 

 After an appellate court finds a clearly wrong apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion.
 
 Clement, supra; Cyrus v. U.S. Agencies Ins. Co.,
 
 41,826 (La.App.2d Cir.3/14/07), 954 So.2d 261.
 

 The findings of fault against the Boyds and Schysm were not clearly wrong. Neither the Boyds nor Schysm have asked this court to reallocate the percentages of fault in the event that the part of the judgment in favor of Schysm and against DOTD was reversed. In fact, in his original reply brief, Schysm submitted that fault allocation was appropriate and not an abuse of ^discretion. Schysm’s own appeal addressed quantum only. Therefore, we will not address the percentages of fault allocated against' Schysm and the Boyds, and they remain as decided by the jury.
 

 CONCLUSION
 

 We reverse the judgment insofar as DOTD was found liable for any damages. In all other respects, the judgment is affirmed. With Schysm and the Boyds to share costs equally, the judgment is REVERSED IN PART and AFFIRMED IN PART.
 

 [1]
 

 . The criminal threshold relative to La. R.S. 14:98 had been lowered to 0.08% in 2001, but
 
 *980
 
 this change did not take effect until September 30, 2003. In the civil statute pertaining to immunity from liability, La. R.S. 9:2798.4, the threshold remained 0.10% until amended in 2004.
 

 [2]
 

 .
 
 Mrs. Towne was dismissed as a party at trial after it was learned that she had donated the property to a relative in 2000.
 

 [3]
 

 . Using a perception and reaction time of three seconds and a speed of 70 mph, the stopping distance is calculated as being 530 feet, which is well outside the range of headlights.
 

 [4]
 

 . In 1965, die organization’s name was “American Association of State Highway Officials” or "AASHO.”
 

 [5]
 

 . A state trooper testified that he received six to seven complaints a week about animals on the highway. Another state trooper testified that he personally saw cows on the road twice a month.